THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANGEL CLAUDIO and RANDOLFO MALDONADO, Respondents.

Second Department, March 15, 1982

**APPEARANCES OF COUNSEL**

*John J. Santucci, District Attorney (Joseph Fisch, Joseph J. Hester, Deborah Carlin Stevens, Barbara H. D. Goldberg* and *Barry A. Schwartz* of counsel), for appellant.

*Albert A. Gaudelli* for Angel Claudio, respondent.

*Marvyn M. Kornberg* for Randolfo Maldonado, respondent.

**OPINION OF THE COURT**

WEINSTEIN, J.

Several issues with significant constitutional ramifications are raised by this appeal. The primary issue is whether a defendant's confession to law enforcement personnel made prior to the initiation of formal judicial proceedings should be suppressed because it was the result of incompetent advice given by an attorney whom the defendant retained. We are of the opinion that where the law enforcement personnel did nothing to persuade the attorney to give the advice, the confession should not be suppressed.

A. FACTS

I

At approximately 4:10 A.M. on May 15, 1980, in Queens, New York, Steven Zweikert was murdered in the course of a robbery committed while he was returning home from a

high school prom. On May 19, 1980, as a result of an anonymous tip, police investigating the killing went to the home of defendant Claudio and requested that he come to the precinct for questioning. At the precinct he told Detective Owen Kelly that he was on the stoop of his building on the night of the robbery/murder, and went to bed at about midnight. Claudio permitted a photograph to be taken of him, and then returned home with his stepmother.

On May 21, 1980, officers were informed that an individual named Andrew Boyle had information about the killing. When contacted that evening, Boyle told the police that at about 6:00 P.M. on May 14 he had entered into a 1974 green Mustang driven by "Buck". In the back seat was a male Hispanic whom he had never met before. As they drove around, Boyle noticed that the person in the back seat was playing around with a gun. Boyle claimed that he got out of the car at about 8:00 P.M. and left. An officer then showed Boyle about six or seven loose photographs, and he selected Claudio's as that of the individual in the back seat of the car.

On the evening Boyle was questioned, Claudio, who was 16 years of age at the time, saw the name of the law firm of Heller and Heller in a telephone book. With the assistance of his cousin, David Erasquine, Claudio called the law firm and left a message. Shortly thereafter, attorney Mark Heller returned Claudio's call, and arrangements were made to meet the following morning at the Brooklyn Criminal Court, where Heller had some business.

Heller, Claudio and Erasquine met the next morning, and Claudio retained Heller to represent him with respect to the Zweikert matter. At a certain point during their conversation, a decision was reached that Claudio would surrender to the Queens County District Attorney. How that decision was reached is a matter of some dispute. According to Heller's testimony at the suppression hearing, Claudio insisted on that course of action, despite Heller's advice that he take some time to think about it. Heller stated that Claudio wanted to come forward and tell the truth because he was extremely troubled by what had happened and could not eat or sleep. On the other hand, Claudio testified that he surrendered because Heller told

him to, and he thought that Heller, as an attorney, knew best. Claudio stated that at no time did Heller discuss with him the possible charges, including felony murder, that could arise out of the incident. Nor did Heller advise him of possible defenses or discuss mandatory sentences. In fact, according to Claudio, Heller told him that if he co-operated with the authorities he "might not even have to go to jail". This is disputed by Heller, who stated that he fully informed Claudio of the consequences of surrendering.

In any event, they arrived at the District Attorney's office at about 1:50 P.M. on May 22. Heller left Claudio and his cousin alone and for the next hour or so spoke with various Assistant District Attorneys, as well as with District Attorney Santucci. Heller told the District Attorney that according to Claudio the shooting was an accident, and that he was remorseful and wished to surrender. Heller attempted to exact a promise that the District Attorney would accept a guilty plea to a charge less than felony murder. Heller was categorically told by Santucci that there would be no plea bargaining in the case. Upon returning to his client, Heller did not tell Claudio that there would be no deal, but only that he was still negotiating.

At a certain point, Assistant District Attorney Del Vecchio came to Heller with a tape recorder and asked that Claudio give a statement. At first Heller refused, saying that they should "[j]ust book him and arraign him". Del Vecchio told Heller, "I want to talk to him, we can't book him and arraign him on nothing". Indeed, according to Santucci, Del Vecchio and other Assistant District Attorneys who testified at the suppression hearing, the prosecutors knew that without a statement they lacked sufficient evidence to charge Claudio with the Zweikert murder. Heller denied being told this, but he did admit knowing that Claudio had been questioned two days earlier, without having been arrested, and he also admitted that he never ascertained whether Claudio was wanted by the police.

Heller then left Del Vecchio and spoke with his client. When he returned, he told Del Vecchio that Claudio wanted to make a statement. As with the initial decision to surrender, the circumstances of this decision are in dis-

pute. Heller testified that he did not want Claudio to give a statement, but that the latter insisted on doing so. Heller claimed to have outlined the alternatives for Claudio but declined to give specific advice, leaving it up to his client to make a decision. Heller acknowledged that he did not tell the District Attorney not to question Claudio. Claudio's testimony was that he consented to make the statement on Heller's advice.

The confession was made with Heller present and after *Miranda* warnings had been given to Claudio. Answers given by Claudio, as evidenced by a tape of the confession, suggest that it was Claudio's decision to surrender and to confess; according to Claudio, however, he had answered affirmatively to these questions because Heller had told him to do so. Whether Criminal Term accepted this explanation is unclear, but it is clear that Criminal Term concluded that Heller did have at least some control over Claudio as to the statement, and could have prevented the confession from being made if he had chosen to.

After the confession, Claudio was told that he was going to be arrested. Up to that point, he had not been handcuffed. Claudio testified that, when told that he was under arrest and was going to jail, he was surprised and angry, and that he felt Heller had "fooled" him.

## II

Shortly thereafter, District Attorney Santucci held a press conference in which Heller participated. Heller also made statements to the press subsequent to the press conference. Among other things, Heller made a plea through the media to the other persons involved in the Zweikert robbery and homicide to surrender themselves. According to Santucci, he was asked by Heller to join in this plea; he flatly refused.

Defendant Maldonado saw and heard on television Heller's appeal to surrender. On May 24, with the assistance of Claudio's aunt, Maldonado contacted Heller by telephone and discussed surrendering. Maldonado testified that Heller told him to wait until the weekend was over, that he, Heller, would turn him in on the following Tuesday, and that if anything happened in the meantime, he should co-

operate with the police. Heller disputes this account; he testified that he told Maldonado that he would not give any advice over the telephone. There is no indication in the record that Heller was given Maldonado's name, or that they discussed the terms of any representation. Subsequent to the telephone conversation, Heller called Detective Kelly and informed him that he might have someone to surrender and would get back in touch.

On May 26, Detective McKnight received an anonymous telephone call. The caller said: "I am calling about the student killing, he's waiting to give up at 359 Crescent St. He's waiting for you." He gave the person's name as "Randy". Thereupon, four officers, including two detectives, went to an apartment at the location. Several persons were in the apartment, including Mrs. Freida Maldonado and about six other relatives of defendant Maldonado, three of whom were children.

The officers were invited into the home, and Mrs. Maldonado called her son inside to join them. According to the officers, Maldonado was told that they were investigating the Zweikert homicide and that they were told he might have some information which would help them. At that point, Maldonado stated: "I was with Angel that night, it was an accident."

Detective Kelly then took Maldonado into a bedroom and, with his mother present, told him he was going to be arrested and questioned further. According to Kelly, prior to questioning Maldonado in the bedroom, he gave him his *Miranda* warnings. This is disputed by Maldonado's mother and aunt, who stated that it was only after Maldonado finished making further admissions that the *Miranda* warnings were given. According to their testimony, when Maldonado was told he had a right to remain silent, he refused to say anything more.

Subsequently, in a police car on the way to the precinct, Maldonado was questioned again and made additional statements. Maldonado testified that in the police car he told the officers he had spoken to a lawyer. Detective Kelly asked him who the lawyer was. When Maldonado hesitated, Kelly asked him if it was Heller. Maldonado said yes.

Assistant District Attorney Del Vecchio arrived at the precinct shortly after Maldonado was brought in. Heller had been contacted, and when he arrived, Del Vecchio asked him if he represented Maldonado. Heller asked to speak to Maldonado first. When the attorney returned from speaking to Maldonado, Del Vecchio asked him whether his representation of Maldonado had just begun when they spoke to each other in the precinct. Heller said it had.

Both defendants were indicted for murder in the second degree (felony murder), attempted robbery in the first degree, and criminal possession of a weapon in the second degree. Following their indictment, both defendants filed omnibus motions, seeking, *inter alia,* suppression of all statements made by them. Criminal Term ordered a hearing, and after receiving extensive testimony, granted the motions insofar as they were to suppress. The People appeal.

## B. THE LAW: DEFENDANT CLAUDIO

We begin with the assumption that Heller advised Claudio to surrender and confess, and that Claudio's actions were based upon that advice. Whether Claudio insisted on confessing, irrespective of the consequences, or whether he did so at Heller's prompting, is a question of credibility. Criminal Term found that Claudio was acting on Heller's advice, and that Heller did have at least some control over Claudio and the situation. Criminal Term's conclusions are supported in the record and therefore should not be disturbed on appeal (see *People v Curatolo,* 76 AD2d 524, 528). We note in this regard that the court credited Del Vecchio's testimony that he told Heller that they lacked sufficient evidence, without a confession, to arrest Claudio. Heller himself admitted that he never made an inquiry as to whether Claudio was wanted by the police. Given these findings, and the fact that Heller was told that there would be no plea offer, it must be concluded that Heller failed to fulfill his responsibility to protect his client's interest diligently and competently. It is significant that the People, on appeal, have not argued to the contrary.

The issue, however, is whether Heller's conduct deprived Claudio of his constitutional rights.[1]

### I

Criminal Term found that Heller's representation of Claudio was ineffective, resulting "in a clear surrender of the defendant's constitutional privilege". In the court's opinion, it was Claudio's right to effective assistance of counsel under the Sixth Amendment of the United States Constitution that was violated. Further, the court found that Heller's incompetent assistance tainted Claudio's confession in that it was made consequent to an uninformed waiver of his Fifth Amendment right against self incrimination.

In our view, Criminal Term's analysis incorrectly presupposes that Claudio's Sixth Amendment right to counsel had attached at or prior to the time he made his confession. The right to counsel under the Sixth Amendment does not attach every time a person becomes involved with law enforcement authorities. The trigger for the Sixth Amendment right to counsel is the "initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (*Kirby v Illinois,* 406 US 682, 689).

In this case, no judicial proceedings had commenced. Claudio had not been arraigned, and no criminal complaint had been filed (cf. *Brewer v Williams,* 430 US 387). In fact, he had not even been arrested; indeed, as Assistant District Attorney Del Vecchio told Heller, without Claudio's confession, there was insufficient evidence to "book him". Accordingly, Claudio's Sixth Amendment right to counsel had not yet attached, and therefore any argument premised on the Sixth Amendment must fail (see *United States v Zazzara,* 626 F2d 135; *Brown v United States,* 551 F2d 619).

Aside from the Sixth Amendment, there is a right to counsel which arises out of the Fifth Amendment right against self incrimination. "[T]he right to have counsel

---

1. Heller was relieved as Maldonado's attorney on June 3, 1980 by the Criminal Court in Queens County, because of the conflict of interest in representing both defendants. Heller was later discharged as Claudio's lawyer, and both defendants were assigned counsel pursuant to article 18-B of the County Law.

present at [a custodial] interrogation is indispensable to the protection of the Fifth Amendment privilege" against self incrimination (*Miranda v Arizona,* 384 US 436, 469). This is not a Sixth Amendment right to counsel, since, as noted above, that right is triggered with the advent of judicial proceedings. Rather, it is, in effect, a right to counsel found necessary " 'to guarantee full effectuation of the privilege against self-incrimination' " (*Kirby v Illinois, supra,* p 689, quoting from *Johnson v New Jersey,* 384 US 719, 729). The distinction between the right to counsel under the two amendments can be critical, as the Supreme Court recently noted (see *Rhode Island v Innis,* 446 US 291, 300, n 4; cf. *Brewer v Williams, supra*).

Any claim by Claudio that his Fifth Amendment right to counsel under *Miranda* was violated must turn on whether his confession was given while he was undergoing custodial interrogation. If Claudio was not in custody when he made the confession, the rule of *Miranda,* and thus his right to counsel under *Miranda,* has no application (see *Beckwith v United States,* 425 US 341; *United States v Zazzara, supra*). The test in determining the existence of custody is an objective one: "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position" (*People v Yukl,* 25 NY2d 585, 589). Absent some obvious, tangible constraint, such as handcuffs or drawn guns, or absent explicit language from law enforcement personnel indicating restraint, none of which are present here, the courts have looked at four factors: (1) was there probable cause for an arrest; (2) what was the subjective intent of the interrogation; (3) what was the suspect's subjective belief as to his freedom; and (4) was the investigation focused on the suspect (see *United States v Micieli,* 594 F2d 102).

In this case, there was no probable cause to arrest prior to Claudio's statement. The intent of the interrogators is clear, for without a statement Claudio would not be booked or arraigned. As to the defendant's state of mind, it might be argued that any person, innocent or not, who turns himself in in connection with a murder of which he knows he is suspected, would reasonably believe that he would immediately be placed in custody. However, Claudio him-

self testified that he was surprised and angry when he was told that he was under arrest and would have to go to jail. As regards the last factor, Claudio was indeed the focus of the investigation. However, that factor is insufficient by itself to support a finding of custody. Accordingly, we conclude that Claudio was not in custody and therefore his contention, insofar as it is premised on the Fifth Amendment, fails. In sum, then, we find that Claudio was not denied effective counsel under the United States Constitution (see *People v McKie,* 25 NY2d 19).

## II

While Claudio cannot complain about ineffective counsel on Federal constitutional grounds, a line of argument still open to him is that based on the New York State Constitution (NY Const, art I, § 6). As the Court of Appeals has frequently noted, there are two distinct lines of cases which consider the circumstances in which the right to counsel has indelibly attached under our State Constitution (see *People v Kazmarick,* 52 NY2d 322; *People v Cunningham,* 49 NY2d 203; *People v Settles,* 46 NY2d 154).

The first began with cases such as *People v Di Biasi* (7 NY2d 544) and *People v Meyer* (11 NY2d 162), and was recently manifested in *People v Samuels* (49 NY2d 218). These cases hold that the right to counsel arises with the commencement of formal adversary proceedings, such as an arraignment, indictment, or the filing of a felony complaint. This runs roughly parallel to the Federal cases interpreting the Sixth Amendment right to counsel, and are also founded on the principle that when formal judicial proceedings commence, "the character of the police function shifts from investigatory to accusatory" and the assistance of counsel becomes "indispensable" (see *People v Settles, supra,* p 163; *People v Kazmarick, supra,* pp 326-327; cf. *Moore v Illinois,* 434 US 220, 228; *Kirby v Illinois, supra,* pp 689-690).

The second line of cases began with *People v Donovan* (13 NY2d 148). As was noted in *People v Settles (supra,* p 162), this line grew out of the need to protect suspects from prearraignment and preindictment police abuse. Thus, the court in *Donovan,* looking to the privilege against self

incrimination and the right to due process (NY Const, art I, § 6), held that a person in custody and represented by an attorney cannot waive his rights outside of the presence of his attorney, despite the fact that no judicial proceedings had taken place.

The line of cases beginning with *People v Donovan* (*supra*) traverses roughly the same ground as those premised on *Escobedo v Illinois* (378 US 478), and *Miranda v Arizona* (*supra*) and, in fact, the Supreme Court in *Escobedo* relied on *Donovan* (*Escobedo v Illinois, supra,* pp 486-487). As with *Miranda,* the *Donovan* cases are predicated on the principle of "fundamental fairness, the belief that an attorney's presence is the most effective means of minimizing the disadvantage of the accused person in custody, and the recognition that an unrepresented defendant in custody who has requested an attorney has indicated his own belief that without legal advice he is not competent to deal with those in whose custody he is being held" (*People v Kazmarick, supra,* p 327; cf. *Miranda v Arizona, supra,* pp 469-470; see *People v Cunningham, supra; Edwards v Arizona,* 451 US 477).

The development of the *Donovan* concept continued in *People v Sanchez* (15 NY2d 387), *People v Arthur* (22 NY2d 325) and *People v Hobson* (39 NY2d 479), and was further extended in *People v Rogers* (48 NY2d 167) and *People v Cunningham* (*supra*). A very recent decision, representing perhaps the outer limit of the doctrine, is *People v Skinner* (52 NY2d 24). There, it was held that a person not yet in custody may not be questioned outside of the presence of his attorney about a matter under investigation when the interrogators know that he has retained an attorney to represent him in relation to the very subject being investigated. In *People v Skinner* (*supra*) the defendant had been subject to repeated police contacts and was clearly a suspect. As a result of being questioned, he hired a lawyer. By so doing, he "indicated that he felt himself unable to deal with the authorities without legal assistance" and "activated his constitutional right to interpose an attorney between himself and the overwhelming power of the State" (*People v Skinner, supra,* p 32). The court ruled that after the police were made aware that the defendant had re-

tained counsel, they could not question him outside of the presence of counsel without a waiver of counsel made in counsel's presence.[2]

Applying *People v Skinner* (*supra*) to the facts at bar, it is clear that Claudio's right to counsel under our State Constitution had attached prior to his confession. He had been questioned by the police in relation to the Zweikert investigation. As a result, he sought the aid of counsel, and retained Heller. The authorities were obviously made aware of Heller's representation when the latter appeared at the District Attorney's office in order to surrender Claudio. The holding of *People v Skinner* (*supra*) is, therefore, applicable (cf. *People v Marrero,* 51 NY2d 56).

### III

Heller was present when Claudio waived his right to remain silent and when he was questioned. In these respects, Claudio's rights under *People v Skinner* (*supra*) were scrupulously honored. The question remains, however, whether the fact that Heller's advice was incompetent somehow violated Claudio's right to counsel.

It has often been stated that the right to counsel under the Sixth Amendment is the right to effective counsel (*Cuyler v Sullivan,* 446 US 335, 344; *McMann v Richardson,* 397 US 759, 771, n 14). Similarly, the right to counsel under the New York Constitution, as interpreted in the line of cases which measures that right as of the commencement of formal adversary proceedings, includes the right to competent counsel (*People v Baldi,* 54 NY2d 137). To our knowledge, however, no court has held that a defendant was deprived of his constitutional right to counsel by his attorney's incompetence prior to the initiation of formal judicial proceedings. In that respect, this case apparently raises a question of first impression.[3]

---

**2.** The holding in *People v Skinner* (52 NY2d 24) was presaged by our holding in *People v Curatolo* (76 AD2d 524). For a recent application of *Skinner* where, as in *People v Cunningham* (49 NY2d 203), the suspect requested counsel (see *People v Johnson,* 79 AD2d 201).

**3.** In *United States v Zazzara* (626 F2d 135), the Ninth Circuit Court of Appeals was able to avoid the issue, since in that case neither the defendant's Fifth nor Sixth

An analysis of the question before us requires an examination of first principles. As already noted, the Sixth Amendment right to counsel, as well as its parallel State constitutional right, is triggered with the advent of judicial proceedings, because it is then that the assistance of counsel is deemed indispensable. Not only does a defendant find himself facing the prosecutorial power of the State, but he becomes "immersed in the intricacies of substantive and procedural criminal law" (*Kirby v Illinois, supra,* p 689). His need for adequate legal assistance at that point is clear (*Cuyler v Sullivan, supra,* pp 343-344). Thus, the right to counsel is broadest when judicial proceedings commence.

It is true that prior to the initiation of formal proceedings, the right to counsel may attach under the *Donovan* line of cases, and under *Skinner (supra)* in particular, because of the perceived need of a suspect in custody to interject an attorney between himself and the inquisitorial power of the State. But no considerations regarding the complexity of the criminal law and of judicial proceedings arise. We believe that prior to the initiation of formal proceedings the right to counsel is accordingly more limited than that arising under the Sixth Amendment.

*People v Donovan* (13 NY2d 148, *supra*) and its progeny require that the authorities refrain from questioning a defendant or suspect outside of the presence of his attorney, absent a waiver of his rights made in the presence of counsel. We see no reason to require, as is indeed required in instances where judicial proceedings have commenced, that the courts go beyond the presence of counsel and examine the quality of his advice. Uniformly, cases which examine the effectiveness of counsel involve situations in which the State, usually through its Judges, has failed in its duty to oversee the criminal process and to discern and prevent ineffective representation. It is unnecessary here to retrace the well-chronicled development of the standards for competency, from the "farce and mockery" test to the "reasonable competence" standard and the "flexible

Amendment rights had been triggered. The court did not say how it would have handled the case if the Fifth Amendment right to counsel had attached.

framework" approach (see, e.g., *People v Baldi,* 76 AD2d 259, 278-281, revd on other grounds 54 NY2d 137, *supra,* for description of various standards and their development). It is sufficient to note that inherent in the formulation of each standard is the assumption that Judges on the pretrial or trial level will police the competence of lawyers practicing before them. This factor of judicial involvement is not present in a case such as this, where the claim of incompetence focuses on events prior to any judicial proceedings. Indeed, in *People v Tomaselli* (7 NY2d 350), the Court of Appeals held that only when ineffective counsel is brought about through judicial action or inaction will a defendant be entitled to relief.[4]

While Heller's advice may have been egregious, his actions did not occur in the context of a trial or other proceeding, wherein a Judge should have been aware of it and corrected it. Nor can it be argued that the District Attorney had an obligation to assess the competency of counsel's advice. And, even assuming a District Attorney has such an obligation in an extreme instance, in this case the District Attorney did not know that Heller was giving incompetent advice. Heller told District Attorney Santucci and his assistants that Claudio was remorseful and insisted on turning himself in and on making a statement. Claudio himself, in his confession, indicated that it was his idea. If a suspect insists on confessing, a defense attorney is not incompetent because he fails to stop him. The attorney should, of course, advise his client of the consequences, and take measures to limit his client's exposure, if possible. But from what the District Attorney knew, that is exactly what Heller was attempting to do. As the Supreme Court said in *Miranda v Arizona* (384 US 436, 478, *supra*) "[t]here is no

---

4. The focus in *People v Tomaselli* (7 NY2d 350) is on the need for preventive action by the trial court. A case illustrating this focus is *Lanza v New York State Joint Legis. Comm. on Govt. Operations* (3 NY2d 92), relied on in *Tomaselli.* In *Lanza,* the Court of Appeals refused to enjoin the use of a recording of a confidential conversation between a lawyer and his client. While not condoning such interference in the attorney/client relationship, the recording was not enjoined since the interference did not occur "in connection with a proceeding directed against" the client (*Lanza v New York State Joint Legis. Comm. on Govt. Operations, supra,* p 98). The *Lanza* holding was effectively overturned with the 1958 enactment of section 353-a of the Civil Practice Act, now included in CPLR 4503, forbidding the introduction of evidence obtained in violation of the attorney/client privilege.

requirement that police stop a person who enters a police station and states that he wishes to confess to a crime", and the same holds true when that person is accompanied by an attorney (see *People v Kaye,* 25 NY2d 139).

It is incumbent on a court to prevent incompetence (*People v Medina,* 44 NY2d 199, 207).[5] A well-placed admonition to counsel might be sufficient, whether before or during trial. In an extreme case of incompetence, the court may even go so far as to disqualify an attorney from further representation (see *United States v Rogers,* 471 F Supp 847, affd *sub nom. United States v Raife,* 607 F2d 1000). However, in a case such as this case, where the alleged incompetence occurred at a time where there was no opportunity or possibility of contemporaneous judicial intervention, the courts will not look back in an attempt to measure the competency of the advice given to an uncharged suspect by his retained counsel.

These principles are, in our view, fully consistent with an appropriate balance between an individual's rights and the responsibilities of the State. Whether or not advice given by an attorney is competent is often an extremely difficult question. A Judge should question an attorney's performance with caution, lest he interfere with counsel's legitimate strategy and intrude on the attorney/client relationship (see *United States v Decoster,* 624 F2d 196, 208). Determining competence is a "judgment call", requiring expertise normally beyond the ken of lay persons. Yet the defendant argues that law enforcement personnel, without judicial training, cannot take a confession when made on the advice of incompetent counsel. Thus, any time an individual gives a confession in the presence of counsel, defendant would have us hold that the interrogator has a burden to inquire as to the competency of counsel and his advice to his client. Not only does this pose an unjustifiable intrusion into the attorney/client relationship, it places an

---

5. A 1975 survey conducted by the American Bar Association revealed that of 1,422 Judges surveyed, 96% of them had responded to incompetence by giving "instruction or advice" in chambers, 77% had "rebuked" counsel in chambers, and a majority had given "instruction or advice" in open court (Maddi, Trial Advocacy Competence: The Judicial Perspective, 1978 Amer Bar Foundation Research J, 105, 129).

impossible burden on the law enforcement officer. How is the law enforcement officer to make such a judgment (cf. *People v Servidio,* 77 AD2d 191, affd 54 NY2d 951)?

In this case, the interrogators were attorneys for the State and not police officers. That distinction does not alter the result, since there is a need to formulate a useable and uniform rule. Interrogation by law enforcement personnel need not be predicated on a determination that the suspect has received adequate and effective advice.[6] Making a distinction within this rule between interrogators from a District Attorney's office and those from a police department would only discourage the practice of using an Assistant District Attorney to take a confession. That practice should, to the contrary, be encouraged since it does help to protect an individual's rights under the law. Furthermore, such a distinction would be unworkable and unfair; an experienced policeman may be far more aware of a suspect's legal rights than an inexperienced young Assistant District Attorney. Finally, and most importantly, the question of effective representation is best left to judicial expertise, and not to the discretion of law enforcement personnel, no matter how well trained.

In sum, we are of the view that Claudio's constitutional right to counsel was not violated by the incompetency of Heller's advice. The focus in a case such as this, where the right to counsel arises because a suspect has chosen to place an attorney between himself and the State, should be on whether the authorities have honored the suspect's choice by ceasing all questioning in the absence of counsel, rather than on whether the attorney gave good advice. The converse would only penalize the People for that which could not reasonably have been prevented. The job of insuring effective representation, for both policy and practical reasons, is best left to the courts and not to law enforcement officials. By so holding, we are acknowledging a factor inherent in all the formulations for determining effectiveness: the need to encourage judicial intervention in cases of incompetent representation (see Schwarzer,

---

6. Whether more is required of law enforcement personnel conducting an interrogation after the commencement of formal judicial proceedings need not be resolved in this case (cf. *United States v Mohabir,* 624 F2d 1140).

Dealing with Incompetent Counsel — the Trial Judge's Roles, 93 Harv L Rev 633; see, e.g., *People v Macerola,* 47 NY2d 257; *People v Wilson,* 15 NY2d 634).[7]

## C. THE LAW: DEFENDANT MALDONADO

Criminal Term held that when Maldonado was questioned in his living room, he was in custody. The court's conclusion was predicated on defense testimony to the effect that the four officers present in the room were talking to Maldonado at the same time, that they "demanded" information, and that "some of the nieces started to cry during the twelve-fifteen minutes of questioning". His initial statement, that "I was with Angel that night, it was an accident", was thus suppressed as being made without prior *Miranda* warnings during custodial interrogation.

Criminal Term also credited the defense witnesses who testified that *Miranda* rights were given to Maldonado only after he made further statements in the bedroom, whereupon he refused to say anything more. In light of this finding, the court suppressed these statements, as well as those made subsequently in the police car.

On the record before us we conclude that the proof established that the interrogation in the living room was not custodial. Under the objective test for custody (*People v Yukl,* 25 NY2d 585, *supra*), "the questioning of a defendant in her own home by police officers is not, without more, sufficient to conclude that the interrogation was custodial" (*People v Paulin,* 25 NY2d 445, 449).

There is no evidence that Maldonado was restrained in any significant way. He was not under arrest (cf. *People v Rodney P.,* 21 NY2d 1). The fact that the questioning lasted 12 to 15 minutes is insufficient; courts have found that questioning of a far greater duration was noncustodial (see *People v Yukl, supra*). The questioning occurred in Maldonado's own home, in the presence of his family. He

---

7. We express no opinion on whether the result would be different if the interrogators knew that Claudio was acting pursuant to bad advice. As noted above, the District Attorney did not know that Heller was giving incompetent advice and that Claudio was simply following the advice.

was not isolated (cf. *People v Mason,* 59 AD2d 580 [defendant questioned alone in police car outside his home; court found no custody]). The fact that there were four officers present was not inherently coercive or an indication that Maldonado was under restraint (cf. *People v Williamson,* 71 AD2d 632, affd 51 NY2d 801; *People v Liccione,* 63 AD2d 305 [questioning by three officers noncustodial]). The officers never accused him or threatened him; at most, they "demanded" information. The fact that some of Maldonado's nieces started crying is not indicative of anything more than that they were upset.

Absent objective evidence of restraint, we must look at other factors, as we did with respect to Claudio. The record is silent as to Maldonado's subjective belief. The police officers believed an arrest was a possibility when they went to the apartment. However, they had no idea for whom they were looking; all they had was a name, "Randy", given them by an anonymous caller, and an address. They had no probable cause or even a reasonable suspicion that Maldonado was involved in the Sweikert killing. According to an officer's testimony, it was only after Maldonado made his initial statement that he was placed under arrest.

Under these circumstances, we conclude that Maldonado was not undergoing custodial interrogation when he made the statement in the living room. Accordingly, the lack of prior *Miranda* warnings does not preclude the statement's admissibility. Nor was there intimidation present such as to render the statement involuntary in the traditional sense of the term. The statement was "the product of an essentially free and unconstrained choice" (*Culombe v Connecticut,* 367 US 568, 602). The statement is therefore admissible.

Maldonado argues that an alternate ground for suppressing all of his statements, including the admission in the living room, is that he had been improperly advised by Heller on the telephone to co-operate with the police. In one respect, Maldonado's argument goes beyond that posited by defendant Claudio. Contrary to Maldonado's con-

tention, there is no indication in the record that Heller was acting as the District Attorney's agent in obtaining Claudio's confession. On the other hand, Heller's appearance with District Attorney Santucci at the press conference and Heller's plea to the others involved in the crime to turn themselves in does tend to indicate that Heller was advancing conflicting interests in making such a plea. If in fact Heller and Maldonado had entered into an attorney/client relationship prior to the latter's arrest, and as Criminal Term found, Heller told Maldonado to co-operate with the police, it may well be that the living room admission would have to be suppressed. The question would be whether Heller's representation of Maldonado was so imbued with the District Attorney's involvement as to lead to the conclusion that Heller was acting jointly with, or as an agent of, the District Attorney's office (cf. *United States v Henry,* 447 US 264; *Massiah v United States,* 377 US 201; *People v Adler,* 50 NY2d 730). However, this issue need not be reached, as Heller did not assume representation of Maldonado until he interviewed him personally at the precinct after his arrest.

 It cannot be said that Heller became Maldonado's attorney during their initial telephone conversation, for there is no indication in the record that Heller was even told Maldonado's name, and discussions about any contractual agreement occurred only at the precinct. While Maldonado may have intended to retain Heller prior to his arrest, he had not done so. This is not a case where an attorney and a defendant have an ambiguous relationship, but the authorities are informed prior to questioning of the attorney's involvement (cf. *People v Marrero,* 51 NY2d 56, *supra*). The first word the police received that Heller had spoken to Maldonado was on the ride to the police station, at which time questioning stopped. From the record, it is clear that while Maldonado may have co-operated with the police because of Heller's appeal on television and as a result of their telephone conversation, that co-operation is not tainted because of inappropriate interferences by the District Attorney's office in the attorney/client relationship. At the time Maldonado made his statements, there simply was no attorney/client relationship to be interfered

with, and the statements were consequently not constitutionally infirm.[8]

■ Nonetheless, the statements made by Maldonado after his initial admission must be suppressed because of late *Miranda* warnings. After the initial admission, Maldonado was told that he was going to be arrested. Further questioning was improper absent *Miranda* warnings. Criminal Term's finding that these warnings were not given until after further questioning is solely a matter of credibility — the officer's word against the word of witnesses for Maldonado. We will not disturb that finding, and therefore the statements made in the bedroom must be suppressed.

The conversation in the police car must also be suppressed. Further warnings were not given to Maldonado, despite his election, in the bedroom, to say nothing more. The car conversation was in the same vein as the conversation in the bedroom. Since the statements made in the bedroom should be suppressed, the statements made in the car must be suppressed as being tainted under the "cat out of the bag" doctrine (see *People v Byrne,* 47 NY2d 117, 122; *People v Chapple,* 38 NY2d 112).

D. CONCLUSION

For the reasons set forth above, that part of defendant Claudio's motion which was to suppress his confession must be denied. Defendant Maldonado's motion insofar as it was to suppress is denied as to his first statement, and is otherwise granted as to his later statements.

MOLLEN, P. J., GULOTTA and THOMPSON, JJ., concur.

Order of the Supreme Court, Queens County, dated May 14, 1981, reversed insofar as appealed from, on the law, that part of defendant Claudio's motion which was to suppress his confession is denied and that part of defendant Maldonado's motion which was to suppress certain statements is denied as to his first statement and is granted as to his later statements.

---

8. We note for the record that according to Santucci, the District Attorney's office refused to join Heller in making the public plea to surrender, and that Heller's purpose in making the plea was to help mitigate the case against Claudio.