OPINION OF THE COURT
Joseph G. Golia, J.
A combined Mapp/Wade/Huntley hearing was held on the within two cases consolidated for such purpose. The hearings commenced on April 15, 1993 and continued on April 16, April 20, April 21, May 3, and concluded on May 4,1993.
The People presented Police Officer Jose Alvarez, Detective Walter Panchyn, Detective Manuel Gomez, and Juan Montilla.
The defendant, Jose Modeste, presented David Goldstein, Esq., who testified on his behalf. The defendant, Freddy Caraballo, did not present any witnesses.
FINDINGS OF FACT
Police Officer Alvarez testified that at approximately 11:15 a.m., while riding in his patrol car with his partner, Police Officer Collazo, he responded to 72-47 Metropolitan Avenue. When he arrived at the scene he saw a male lying some 20 feet from 72-47 Metropolitan Avenue who was bleeding from an apparent gunshot wound to his chest. He was also bleeding from the mouth. While the paramedics were assisting the victim, later identified as Juan Ortiz, the victim’s girlfriend approached Police Officer Alvarez. She informed him that someone else had also been shot and she led the officer to the vestibule of 72-47 Metropolitan Avenue where he observed Juan Montilla who had been shot in the chest, legs and arms.
The police officer, born in the Dominican Republic to a Spanish-speaking family, and raised in the Spanish language, *252 spoke in Spanish with Mr. Montilla who stated that he and Mr. Ortiz had been shot by two male Blacks who had driven away in a brown station wagon taxicab. When the officer asked Mr. Montilla if he knew his assailants, Mr. Montilla stated that he did not.
Mr. Montilla was then taken to Jamaica Hospital and Mr. Ortiz was taken to Elmhurst Hospital, where he expired. Officer Alvarez first responded to Mr. Ortiz at Elmhurst Hospital and was told by a doctor that the victim would probably not "make it”. The officer then left and went to Jamaica Hospital to speak to Mr. Montilla.
After speaking with Mr. Montilla at the hospital, the officer called Montilla’s home and learned from his brother that there was talk in the neighborhood that someone was taken at gunpoint off the street. With that information, Officer Alvarez went back to Mr. Montilla and told him, "you’re lying” and that he should tell what really happened.
Mr. Montilla admitted that he had been lying and then proceeded to tell the officer that two males from the Dominican Republic took him at gunpoint and forced him into a station wagon taxicab. One of the men had a silver gun, the other had an automatic weapon. The man driving the taxicab was Ecuadorian. He went on to say that they told him that nothing was going to happen to him, but that they wanted to know where Mr. Ortiz was.
They then drove to 72-47 Metropolitan Avenue where Mr. Ortiz lived. Mr. Montilla and the two men with the guns went up to the house. Mr. Montilla went to the front door while the men with the guns stood on opposite sides of the door. When Mr. Ortiz came to the front door in response to Mr. Montilla’s request, the two men. with the guns pushed Mr. Montilla into the vestibule and attempted to get Mr. Ortiz outside. A struggle ensued and the two men commenced firing their guns at both Mr. Ortiz and Mr. Montilla.
Mr. Montilla then told Officer Alvarez that he knew both of the shooters. He knew one of them as being a killer for hire by the name of "Shogun” or "Chagon”, who was a dark-skinned, thin, male Hispanic from the Dominican Republic with a deep voice. He knew "Chagon” from being involved in the drug trade in the area of 270 Jefferson Avenue with the other shooter as well as the victim, Mr. Ortiz. He stated that he didn’t know the other shooter as well, but he had seen him in the same area, that he was also from the Dominican Republic, and was shorter and heavier than "Chagon”.
*253 Police Officer Alvarez further testified that, in addition to the interviews that he conducted on his own, he also served as a translator for Detective Walter Panchyn and Detective Lydia Husband.
Detective Walter Panchyn testified that he was assigned to this case on the day of the shooting, but when he arrived at the scene, both victims had already been removed by ambulance.
Upon learning that Mr. Montilla stated that he knew one of the shooters as an associate of Mr. Ortiz named "Chagon”, or "Shogun”, Detective Panchyn asked Mr. Ortiz’ girlfriend if she had ever heard of such a person. She said that she had never heard of anyone called "Chagon” or "Shogun”, but she knew a man named "Shotgun” who was a friend of Mr. Ortiz.
Detective Panchyn then went to see Mr. Montilla in the hospital and with the aid of Police Officer Alvarez as a translator spoke with the victim. When Mr. Montilla was asked if the shooter was named "Shotgun”, he indicated a shotgun with his hands but continued with his pronunciation of "Chagon” or "Shogun”.
Detective Panchyn then spoke with a detective in the 83rd Precinct in Brooklyn, which encompasses the area of 270 Jefferson Avenue, and asked if they knew of anyone with the street name of "Shotgun”. He was given the name and address of a Freddy Caraballo, who was known as "Shotgun”.
A photo array containing a picture of Mr. Caraballo along with photos of five other individuals was compiled, as well as a second photo array of six other individuals, all of whom were known associates of Mr. Caraballo. Mr. Modeste’s photograph was among those comprising the second array.
These photo arrays were then shown to Mr. Montilla in the hospital. First he was shown the array containing the photograph of Mr. Caraballo and, after Mr. Montilla picked out the photo of Mr. Caraballo and called him "Shogun”, he was shown the array containing six of Mr. Caraballo’s known associates. When Mr. Montilla examined the second photo array, he picked out the photograph of the defendant, Modeste, and nodded his head up and down.
Detective Panchyn arrested Mr. Modeste in the hallway of the Brooklyn Courthouse on February 24, 1992, and brought him to the station house where he read him his Miranda rights with the aid of Police Officer Alvarez who served as a translator. Mr. Modeste stated that he would be willing to *254 speak. Detective Panchyn then waited for Detective Gomez, who was a Spanish-speaking detective, to take the statement.
Before effectuating the arrest of this defendant, Detective Panchyn spoke to one David Goldstein, who had previously placed a call to the detective. Detective Panchyn testified that Mr. Goldstein told him that he was an attorney and that Mr. Modeste had been in his office and had shown him a newspaper clipping which indicated that Mr. Modeste was wanted by Detective Panchyn in connection with a murder. The detective further testified that Mr. Goldstein asked the detective if Mr. Modeste was going to be arrested. Detective Panchyn responded that he was not going to arrest him but only wanted to speak with him. According to Detective Panchyn’s testimony, Mr. Goldstein said that he did not represent Mr. Modeste in this case or on any other matter.
Prior to the defendant, Modeste, making his statement, Detective Panchyn, by means of elemental Spanish and hand gestures, asked Mr. Modeste if he wanted to make a phone call to a lawyer. Mr. Modeste pointed to the phone and said the word "sister” in English and proceeded to give the detective the telephone number of his sister. The detective dialed the number for Mr. Modeste, who then had a conversation with his sister. He made no further demands or request to call anyone, including a lawyer.
Mr. Modeste, after having been given his Miranda warnings, then made the statements which he now seeks to suppress.
Thereafter, a lineup was conducted, which included Mr. Modeste and five "fillers”. Mr. Montilla picked out Mr. Modeste and said, "he killed my friend”.
Mr. Modeste was then processed for his arrest, during which the police recovered business cards for a car service and three different attorneys from his wallet.
Defendant Caraballo was arrested on May 31, 1992, at 101 W. 126th Street, pursuant to a warrant. The basis of the warrant was the identification of Mr. Caraballo as the shooter by Mr. Montilla, as well as information as to the whereabouts of Caraballo by a person who saw his picture on the "Wanted” board in the police station while that person was being processed for an unrelated arrest.
Mr. Caraballo was first brought to the 26th Precinct and then transferred to the 104th Precinct. He was asked his pedigree information but was not interrogated. Detective Pan *255 chyn addressed him as "Shotgun” during the process. Later, when the detective called out "Shotgun” the defendant, who was then in a holding cell, turned and looked.
As with Mr. Modeste, certain papers were recovered from the person of Mr. Caraballo during the arrest procedure.
A lineup, pursuant to court order, was conducted on August 20, 1992, which contained Mr. Caraballo and five "fillers”, and Mr. Montilla picked out Mr. Caraballo as the person who had shot him.
Detective Manuel Gomez, who is fluent in Spanish, testified that he assisted Detective Panchyn in interviewing Mr. Modeste on February 24, 1992. Mr. Modeste was given his Miranda warnings, in Spanish, and agreed to waive his rights and speak with the detectives. He then gave his statement, in Spanish, as to what had happened on the day in question, and Detective Gomez translated the statement into English and reduced it to writing.
Detective Gomez further testified that he assisted in the lineup proceedings of February 24, 1992, involving Mr. Modeste.
Juan Montilla testified that on January 31, 1992, he was out on the street near 270 Jefferson when two men with guns in their hands forced him into a station wagon taxicab. They took him to his friend Juan Ortiz’ house and they forced him to call Mr. Ortiz downstairs. When Mr. Ortiz came down and opened the door, the two men with guns shoved him into the hallway and then commenced shooting at him and Mr. Ortiz.
He further testified that, although both shooters were wearing hooded sweatshirts, he had sufficient opportunity to see their faces and that he knew both of them. He knew one of the shooters by the name "Shogun” or "Chagon”, having previously met him six to eight times during the course of the last six or seven months. In addition, he had been present while this person was engaged in conversation with other people and had been told that this person was a famous murderer.
He also recognized the other person as someone who had worked with Mr. Ortiz and "Shogun” in selling drugs and had seen this fellow on seven or eight prior occasions.
David Goldstein, Esq. testified that he is an attorney who was engaged in the practice of criminal law during all relevant periods.
He stated that he had represented Mr. Modeste and his *256 then codefendant on an unrelated case in Brooklyn. For reasons which were not disclosed at this hearing, Mr. Gold-stein ceased to represent Mr. Modeste in the Brooklyn case, although he continued to represent that codefendant. On February 20, 1992, that codefendant appeared with Mr. Modeste in Mr. Goldstein’s office.
Mr. Modeste showed the attorney a newspaper article which indicated that Mr. Modeste was wanted in connection to the subject murder. Mr. Goldstein then placed a call to Detective Panchyn who was mentioned in the article, but the detective was not in. He gave his business card to the defendant and told him that he should not talk to the police but to give them the business card. Mr. Modeste left the office without entering into any retainer agreement. It was the first and last time there was any contact between the defendant and Mr. Gold-stein with regard to the herein matter.
Thereafter, on February 24, 1992, between 8:30 and 9:00 a.m., Mr. Goldstein received a return phone call from Detective Panchyn. He told the detective that Mr. Modeste had been in his office with the newspaper clipping and asked the detective if he was going to arrest Mr. Modeste. The detective responded that he would not. Mr. Goldstein then testified that he told the detective that he represented Mr. Modeste and that the detective was not to ask Mr. Modeste any questions.
Mr. Goldstein then learned that Mr. Modeste had been arrested later that same day in the Brooklyn Courthouse. After the arrest, his partner called central booking as well as Mr. Modeste’s family. Mr. Goldstein further informed this court that he did not receive a call from the defendant after the arrest and had no further involvement with the case until he was contacted for the purpose of this hearing.
CONCLUSIONS OF LAW
I find the testimony of all the witnesses to be credible and the facts to be essentially as testified to. The police clearly had probable cause to arrest Mr. Modeste as the result of the identification by Mr. Montilla. Mr. Caraballo’s arrest, pursuant to a warrant, was also predicated upon Mr. Montilla’s identification.
The items recovered from each of the defendants were taken from their persons as part of an inventory search, subject to their lawful arrest.
Probable cause to arrest exists where the facts and circum *257 stances within the officer’s knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed. (See, Carroll v United States, 267 US 132.)
In considering the identification procedures employed herein, I find that the lineup proceedings relating to both Mr. Modeste and Mr. Caraballo were fairly constituted. That the complainant, Mr. Montilla, freely and clearly picked out each defendant without influence from anyone. I do make note of the fact that the individuals depicted in each of the photo arrays previously presented to Mr. Montilla at the hospital did not contain individuals of similar physical characteristics to one another.
The question thus presented is as follows: "Can a photo array containing pictures of individuals with significantly disparate features, nevertheless constitute a fair and untainted identification procedure?” As the question relates to Mr. Modeste, the court answers, "Yes”; with regard to Mr. Caraballo, "No”.
At the time the two photo arrays were compiled, the police had reason to believe that an individual named "Shotgun”, later identified as Mr. Caraballo, was one of the alleged perpetrators. Consequently, when creating the photo array containing Mr. Caraballo’s picture, the police were obliged to include "fillers” who were physically similar to Mr. Caraballo. As this was not done, the identification procedure concerning Mr. Caraballo was therefore tainted. Such, however, was not the case regarding Mr. Modeste.
It is incontroverted that neither Detective Panchyn nor the police of the 83rd Precinct had any inkling that Mr. Modeste was, allegedly, the other shooter involved in the instant matter. He was merely one of six individuals known to be associates of Mr. Caraballo all of whose pictures were placed in a photo array to be shown to the complainant. It is of no moment that these six known associates of Mr. Caraballo are physically dissimilar to one another.
The crux of the issue is that, unlike the photo array in which Mr. Caraballo was the targeted suspect, the array in which Mr. Modeste’s picture appeared did not contain any targeted suspect. It was, in essence, merely a page from a book of "mug” shots. Clearly, it cannot be found that the police improperly influenced the outcome of the identification procedure as it relates to Mr. Modeste. It is simply good police investigation.
*258 I find, further, that the circumstances surrounding the underlying incident, coupled with the fact that Mr. Montilla testified that he had seen these two defendants on various other occasions, establishes sufficient independent source to permit the witness to make an in-court identification of them both.
Hearing testimony revealed that during the processing of Mr. Caraballo after his arrest, Detective Panchyn called out the word "Shotgun” and Mr. Caraballo looked at him. I do not ascribe any special meaning to Mr. Caraballo’s actions and, therefore, I can conceive of no reasons to allow the People to offer such evidence as a tacit admission by Mr. Caraballo that he answers to the name of "Shotgun”. Accordingly, defendant’s application to preclude or suppress such evidence is granted.
In considering the statements of Mr. Modeste, I find that the statements were given only after the defendant was fully and properly advised of his Miranda rights, in Spanish, and only after he knowingly and intelligently waived those rights and voluntarily agreed to make the subject statement.
There remains, however, the issue of whether the police should have been allowed to question him at all.
It is well established that once a defendant requests an attorney, or if an attorney has already entered the proceedings, then the questioning must cease and the defendant can no longer waive his right to counsel except in the presence of his attorney (People v Vella, 21 NY2d 249 [1967]; People v Hobson, 39 NY2d 479 [1976]; People v Cunningham, 49 NY2d 203 [1980]).
An attorney is deemed to have entered the proceedings once the police know or are apprised of the fact that the defendant is represented by counsel. This is clearly the case when an attorney communicates with the police for the purpose of representing the defendant (People v Arthur, 22 NY2d 325 [1968]).
An attorney can represent a person only where an attorney-client relationship exists. In determining whether an attorney-client relationship actually exists, the court may, in its discretion, consider the totality of the circumstances (People v O’Connor, 85 AD2d 92 [1982]; People v Pinzon, 44 NY2d 458 [1978]). The burden of proving the existence of the attorney-client relationship falls, however, on the defendant by a preponderance of the evidence. (People v Patterson, 39 NY2d 288, affd 432 US 197.)
*259 The fact that an attorney-client relationship existed between the parties in the past is not dispositive on the issue of the existence of a present relationship. (See, People v O’Connor, supra.) However, time alone does not serve to eradicate the defendant’s right once it has attached (People v West, 81 NY2d 370).
Where the police are aware of the fact that the defendant is currently being represented by counsel on a different pending case, the client is deemed to be represented by the same counsel for the present charge as well. (People v Rogers, 48 NY2d 167 [1979].) Courts following Rogers, first expanded upon that holding to find a duty on the part of the police to inquire as to whether the defendant has counsel on the pending charge (People v Bartolomeo, 53 NY2d 225 [1981]), or that they would be bound by what they would have found had they so investigated. (People v Rosa, 65 NY2d 380 [1985].) However, Bartolomeo was effectively overturned by People v Bing (76 NY2d 331 [1990]). The Bing Court held that there is no longer a duty by police to investigate as to the status of counsel on a pending charge.
In considering the case at bar, Mr. Goldstein had briefly represented the defendant on a prior unrelated case no longer pending. Any attorney-client relationship between Mr. Gold-stein and this defendant had terminated well in advance of the present police involvement.
The dispositive question to be resolved is whether a present attorney-client relationship was created as a result of defendant’s visit to Mr. Goldstein’s office prior to his arrest and, if so, to further resolve whether the police had sufficient notice of the existence of such a relationship.
The existence of the relationship depends on the client’s purpose in contacting the attorney. In People v Manley (121 Misc 2d 649 [1983]), an attorney who was a friend of the family, after being advised of the defendant’s situation by defendant’s mother, instructed the police to refrain from questioning the defendant in the absence of counsel. That court found that no attorney-client relationship existed because the attorney acted gratuitously as a friend rather than in his capacity as an attorney and he was never authorized by defendant to represent him.
Similarly, it is apparent from the facts and circumstances of the case at bar that Mr. Goldstein was acting gratuitously and without authority to actually represent the *260 defendant as his attorney. He was merely utilizing his good offices to obtain further information as to whether the police had the present intention to arrest Mr. Modeste.
It would not overly strain one’s imagination to believe that if the police had told Mr. Goldstein that they were looking to arrest Mr. Modeste, that there would then be some discussion about legal representation. However, that was not the case here.
Some cases have held that the fruits of the interrogation should be suppressed even though there was no actual attorney-client relationship at the time of interrogation. In those cases there was some initial legal representation, as well as a strong reason to believe that the attorney-client relationship continued between the parties at the time of the interrogation. (People v Marrero, 51 NY2d 56 [1980]; People v Claudio, 85 AD2d 245 [1982]; People v Kaye, 25 NY2d 139 [1969].)
In Marrero (supra), the Court stated that: "The important factor * * * was the police awareness of an attorney’s appearance on the defendant’s behalf, rather than the precise terms of the retainer or appointment. Here, of course, the police were made aware, in the most demonstrable way, of the fact that the defendant was represented by counsel at the time of his arrest.” (People v Marrero, 51 NY2d, at 59.)
However, in Marrero, Claudio and Kaye (supra), unlike the present matter, in addition to the initial phone call, the attorneys actually participated in the defendant’s surrender. In the case at bar, there was only the one, however brief, phone call by Mr. Goldstein to the police. This was insufficient to constitute an attorney-client relationship or to put the police on notice of the existence of such relationship. The facts herein are clearly distinguishable from the line of cases holding otherwise.
There have also been cases holding that phone calls alone were sufficient to put the police on notice of defendant’s representation by counsel (People v Coleman, 43 NY2d 222 [1977]; People v Pinzon, 44 NY2d 458, supra). However, in those cases, the phone calls were made after the defendant was already in the custody of the police and the right to counsel had already attached so that the police had reason to believe that the attorney was actually representing the defendant. In the instant case, Mr. Goldstein’s phone call was made before the arrest of the defendant. The call, therefore, served merely as an inquiry regarding the status of Mr. Modeste. *261 This court finds that the phone call made by Mr. Goldstein was insufficient to put the police on notice of the presence of counsel, or to establish that an attorney-client relationship actually existed.
Accordingly, defendant Modeste’s motion to suppress the subject statements is denied and the People are given leave to offer such statements during their direct case.