**In re VENTURE MORTGAGE FUND, L.P., Debtor.**

**In re David Schick, Venture Mortgage Corp., and A & D Trading Group, L.L.C., Debtors.**

**Bankruptcy Nos. 96 B 45033(SMB), 96 B 42902(SMB), 96 B 43969(SMB), 96 B 46282(SMB).**

United States Bankruptcy Court, S.D. New York.

March 2, 2000.

---

Curtis, Mallet–Prevost, Colt & Mosle, LLP, New York City, Eliot Lauer, Steve J. Reisman, Paul R. Niehaus, of Counsel, for John F. Schmutz, Chapter 11 Trustee

for the Estate of Venture Mortgage Fund, L.P.

Parker Chapin Flattau & Klimpl, LLP, New York City, Amos Alter, of Counsel, for Aurora Cassirer, as Chapter 11 Trustee for the Estate of David Schick and Venture Mortgage Corp.

Law Office of Charles L. Mester, New York City, Charles L. Mester, of Counsel, for Theodore Brodie.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C., New York City, Christine H. Black, of Counsel, Zane & Rudofsky, New York City, Eric Horowitz, Of Counsel, for ATTASCO.

Berlack, Israels & Liberman LLP, New York City, Martin S. Siegel, of Counsel, for Official Committee of Unsecured Creditors.

## MEMORANDUM DECISION SUSTAINING TRUSTEES' OBJECTIONS TO CLAIMS ON GROUNDS OF USURY

STUART M. BERNSTEIN, Chief Judge.

These proceedings concern the defense of criminal usury. Two creditors, Theodore Brodie and ATTASCO, independently advanced substantial sums to the debtor Venture Mortgage Fund L.P. ("Venture"), and the debtor David Schick either guaranteed repayment or co-signed the promissory notes. Their loans bore interest at the annual rate of 27%. After these bankruptcies were commenced, Brodie and ATTASCO filed timely claims. The Schick and Venture trustees objected to the claims, arguing that the annual interest exceeded 25%, New York's criminal usury rate.

The Court tried the objections separately, but with one exception, they raise the same factual and legal issues. As more fully explained below, both sets of claims are barred by the defense of usury, and accordingly, will be expunged.

1. Brodie, an ordained rabbi, also serves as principal of a yeshiva but receives no com-

## BACKGROUND

### A. Theodore Brodie

#### 1. Introduction

Brodie worked in the apparel business from 1961 through 1990. (Transcript of Brodie trial, held Nov. 4, 1999 ("Brodie Tr."), at 56.) After retiring in June 1990, he lived off of investments and disability payments.[1] (*Id.* at 56.) In late 1991, Harry Sussman, the owner of Leisure Apparel, approached Brodie to borrow $200,000.00. (*Id.* at 57–60.) Brodie agreed to make the loan if Sussman met his four conditions: (1) the loan would be fully secured, (2) the loan would bear interest at 24% per annum, (3) Brodie's attorneys would draw up the loan documents, and (4) Sussman would pay Brodie's legal fees. (*Id.* at 59–60.)

The Sussman loan led Brodie to David Schick. Brodie needed an attorney, and a neighbor, Naftuli Silberberg, recommended Schick. (*Id.* at 60–61.) Schick was a partner in the law firm of Frenkel & Hershkowitz where Silberberg's son, Michael, also worked as an associate. (*Id.* at 61.) Brodie, his wife and his accountant subsequently met with Schick and Silberberg, retained Schick to prepare the documents for the Sussman loan transaction, (*id.* at 62–63), and Schick and Silberberg worked together on the Matter. (*See id.* at 144.) Satisfied with the services, Brodie returned to Schick six months later when Brodie agreed to lend Sussman an additional $75,000.00. (*Id.* at 66.) During the same period, Brodie again used Schick's services in connection with a dispute he was having with several partners in a real estate transaction. (*Id.* at 79.)

#### 2. The 1992 Transaction

Up to this point, Schick served solely as Brodie's attorney, and did not participate

pensation. (Brodie Tr. 56–57.)

in the underlying transactions. During the summer of 1992, however, Silberberg approached Brodie to arrange a meeting at Schick's request regarding a potential loan transaction. (*Id.* at 67.) At the subsequent meeting, Schick proposed that Brodie advance $500,000.00. Schick would maintain the money in an escrow account, it would remain there until repayment, and Schick would pay Brodie interest at the annual rate of 20%. Schick assured Brodie that he was Brodie's attorney, the loan was risk free, and the only danger was that the bank might fail.[2] (*Id.* at 68–70.)

█ Brodie tentatively agreed. First, however, he had to satisfy himself that his lending conditions (other than the 24% interest rate) were met, and his wife had to agree. In addition, his accountant had to review the agreement and assure him that there was no risk. (*Id.* at 70.) A couple of days later, Brodie received a $500,000.00 promissory note, dated August 10, 1992, signed by Schick on behalf of Mortgage Venture Ltd. (Brodie Trustees' Exhibit ("BTX") 108), and wiring instructions from Silberberg. (BTX 107.) The note called for monthly interest payments in the sum of $8,333.34 (*i.e.*, 20% per annum), commencing in September of 1992. Unpaid interest and the entire principal were due on December 9, 1992. Evidently satisfied with the documentation, and in accordance with Silberberg's instructions, Brodie wired $500,000.00 into a Frenkel & Hershkowitz IOLA.[3] (Brodie Tr. 72–73; BTX 109.)

█ Brodie and Schick also executed a "shtar iska." Brodie and Schick are Orthodox Jews, and Jewish law prevented Brodie from charging Schick interest. *See Daniel Klein, Note, The Islamic and Jewish Laws of Usury: A Bridge to Commercial Growth and Peace in the Middle East,* 23 Denver J. Int'l L. & Policy 535, 541–42 (Summer 1995) ("Klein"). Accordingly, although the promissory note is purely a secular document evidencing a loan, the parties structured their transaction as a "heter iska," or a type of joint venture to avoid the prohibition against charging interest. *See Leibovici v. Rawicki,* 57 Misc.2d 141, 290 N.Y.S.2d 997, 1000 (N.Y.City Civ.Ct.1968), *aff'd,* 64 Misc.2d 858, 316 N.Y.S.2d 181 (N.Y.Sup.App.Term 1969); Klein 543. In a "heter iska," the moneys advanced are treated as a contribution to the venture. *Id.* The venturer who advances the funds (*i.e.*, the lender) is entitled to an accounting, but the accounting is an onerous process requiring two trustworthy witnesses. (*See* BTX 115.) In lieu of the accounting, the parties execute a "shtar iska" which obligates the other venturer (*i.e.*, the borrower) to pay a fixed monthly return (corresponding to the interest payments called for under the promissory note), and requires the lender to waive any further profits. (BTX 115); *see Arnav Indus., Inc. Employee Retirement Trust v. Westside Realty Assocs.,* 180 A.D.2d 463, 579 N.Y.S.2d 382, 382 (N.Y.App.Div.1992).) In fact, both claimants in these proceedings initially argued that the transactions with Schick and Venture were not loans—and the monthly payments were not, therefore, interest subject to the usury laws—but they have since abandoned these arguments. Nevertheless, the execution of the "shtar iskas" is significant, and will be revisited later.

Brodie regularly received the monthly $8,333.34 payment. (Brodie Tr. 76.) Further, Schick did not return the principal in December, and Brodie continued to receive monthly payments throughout 1993, 1994, and 1995. (*See id.* at 76–78.) According to Brodie, he could have demanded the

---

**2.** The need for the escrow account related to Schick's practice of bidding on mortgage pools offered for sale by the FDIC or RTC. A fuller description of this practice appears in *Cassirer v. Herskowitz (In re Schick ),* 234 B.R. 337, 340 (Bankr.S.D.N.Y.1999).

**3.** An IOLA (or "interest on lawyer account") is authorized by New York law, and permits an attorney to deposit nominal client and trust funds into an unsegregated, interest-bearing account. *See* N.Y. Jud. Law § 497 (McKinney Supp.1999).

return of the principal at any time, but never did; the deal was just too good. (*See id.* at 97.) During this three year period, Brodie received $300,000.00 in interest on his $500,000.00 loan. (*Id.* at 103–04.)

### 3. The December 1995 Rollover

In late 1995, Schick called Brodie with an even better deal. (*Id.* at 78–80.) According to Brodie, Schick told him that he was a valuable client and a reputable person who he liked, and wanted to restructure the loan to pay him more "iska." (*Id.* at 80.) Schick proposed returning $300,000.00 to Brodie through his attorney, Michael Silberberg,[4] now practicing on his own, and rolling over the remaining $200,000.00 into another, similar escrow transaction. (*See id.* at 81.) Silberberg's $300,000.00 participation paid 24% annually. (*Id.* at 86.) Schick's rollover paid 2.25% per month, or 27% annually. (*Id.* at 126–27.)

Brodie could not believe his good fortune. He thanked Schick for his "benevolence," telling him "certainly I'll take it, because where else can I get such Iska payments anywhere else." (*Id.* at 81.) According to Brodie, both parties acknowledged that Schick was his lawyer, and Brodie sought and received assurances that the transaction was legal. (*See id.* at 82.) Although Brodie implied that he accepted the proposal in reliance on his trust in Schick and the assurances he received, it was the money that moved him:

Q: Did you rely on anything Schick did or told you before agreeing to split up the $500,000.00?

A: I relied on Iska payments coming every month on time for three and a half years or so, and all the agreements that he had structured, to my knowledge, were terrific, and that is what I relied on, nothing else.

(*Id.* at 97–98.)

The deal did not require another advance; Schick simply signed and delivered a new $200,000.00 promissory note, dated December 20, 1995, individually and on behalf of Venture Mortgage Fund, Ltd. (BTX 113.) The parties also signed an escrow agreement, (BTX 114), and a "shtar iska." (BTX 115.) The note called for monthly interest of $4,500.00, and repayment of the principal amount on March 21, 1996. Brodie received the monthly interest payments aggregating $10,500.00 on the two transactions in January, February and March 1996. (Brodie Tr. 89–91.) He did not receive any further interest payments from Schick on the $200,000.00 loan, and the principal was never repaid. (*Id.* at 95–96.) After the various Schick-related bankruptcy cases were filed, Brodie submitted proofs of claim, each in the sum of $200,000.00, in the Venture Mortgage Fund, L.P., (BTX 132), Schick (BTX 133), and Venture Mortgage Corp. cases. (BTX 134.)

### 4. The Amended Tax Returns

Ordinarily, this would end the story, but the Brodie matter has a strange twist. Brodie always reported the Schick interest payments as income, and paid corresponding income taxes. In 1996, after Brodie realized that he had been "swindled," he instructed his accountant to see if he could recover any money from the Federal Government. (Brodie Tr. 105–06.) His accountant prepared and Brodie signed amended federal income tax returns for 1993, 1994 and 1995, recasting the aggregate $300,000.00 in interest payments as the return of principal. (*Id.* at 106–07.) This reduced his annual taxable income by $100,000.00, and consequently, reduced his income tax liability, resulting in an overpayment. (*See* BTX 175) (Amended 1993 Income Tax Return showing a refund due of $30,245.00). As a result of these amendments, Brodie received a tax refund of $50,000.00, (*id.* at 109), although he insisted that the IRS rejected his position,

---

4. Brodie used Silberberg as his lawyer after Silberberg left Schick. (*See* Brodie Tr. 145.)

and the payment represented a compromise. (*See id.* at 147–48.)

## B. ATTASCO

### 1. Introduction

ATTASCO is a d/b/a used by the brothers Allen Sausen ("Allen") and Leonard Sausen ("Leonard") for the purpose of investing with Schick and Venture, and Schick-related entities. (*ATTASCO Joint Pre–Trial Order,* dated Aug. 18, 1999 ("*ATTASCO JPTO*"), at ¶ 5(a).) Allen and Leonard are ATTASCO's sole principals. (*Id.* ¶ 5(b).)[5] Leonard is a graduate of New York University with a degree in marketing. He is a partner in a manufacturing business, involved in the sales and production end. (ATTASCO/I Tr. 38.)[6] Allen, who is engaged in the business of exporting appliances and electronics, has a master's degree in market research. (ATTASCO/II Tr. 5–6.) Neither has any formal legal training. (ATTASCO/I Tr. 38; ATTASCO/II Tr. 5–6.)

In the fall of 1993, Allen sought to retain an attorney with expertise in real estate mortgages. His brother recommended David Schick, a partner in the firm of Frenkel & Hershkowitz ("F & H"). (ATTASCO/II Tr. 6–7.) Allen first spoke with Schick by telephone in the fall of 1993. (*Id.* at 7–8, 36.) During that conversation, Allen asked Schick to represent him in connection with a simple mortgage transaction. (*Id.* at 7–8.) Schick informed him at the time that he customarily worked on more substantial cases, but agreed to take on the representation after Allen described it to him. However, Schick assigned the responsibility for performing any work in connection with the case to Michael Silberberg, an associate employed by his firm. (*Id.* at 8.) Allen met briefly with Schick in his office shortly thereafter, but dealt exclusively with Silberberg in connection with the mortgage transaction. Silberberg took the representation with him when he left Schick's firm. (*Id.* at 8–9.)

### 2. The Regal Transaction

In 1994, the Sausens inherited substantial sums from their late mother's estate, and looked for places to invest. (ATTASCO/I Tr. 39.) Leonard consulted with his partner, David Brodie, and David's father, Rabbi Theodore Brodie. Rabbi Brodie told Leonard that he had invested over the years with Schick through Michael Silberberg, Schick's former associate. (ATTASCO/I Tr. 38.) Leonard investigated Schick's reputation, and heard, to his satisfaction, that Schick was an Orthodox Jew, an attorney, an expert in real estate, honest and trustworthy. (ATTASCO/I Tr. 41–42.) Allen had also heard that Schick was prominent in the Jewish community and that he was a well-known real estate attorney. (ATTASCO/II Tr. 80.)

As a result of these conversations, the Sausens elected to invest with Schick. (ATTASCO/I Tr. 42.) In July 1995, they called Silberberg on Brodie's advice, and ultimately agreed to participate in a transaction involving Regal Trade, an entity that Schick used for his investments. (*Id.* at 43.) In this transaction, Regal loaned $2,750,000.00 to Schick at an annual interest rate of 24%. The money was to be held in escrow by Schick for ninety days, and returned to the lender at that time. (*See* ATTASCO Trial Exhibit ("ATX") 4.)

The Sausens relied exclusively on Silberberg in making this investment;[7] they did not deal directly with Schick. The Sausens did not retain attorneys because they trusted Silberberg based on Brodie's recommendation, and Silberberg assured them that the Regal documents were the

---

**5.** ATTASCO and the Sausens are used interchangeably in this opinion.

**6.** "ATTASCO/I Tr." refers to the October 20, 1999 trial transcript. "ATTASCO/II Tr." refers to the October 21, 1999 trial transcript.

**7.** Allen contributed $350,000.00 toward the Regal Trade loan, (ATX 8), and Leonard contributed $150,000.00. (ATX 9.)

same as those prepared by Schick in other, similar transactions. (ATTASCO/I Tr. 44.) Allen Sausen testified that he could not recall whether he asked Silberberg if the transaction was legal or whether Silberberg ever stated that it was. According to him, he had no reason to question the legality of the loan because Silberberg, a real estate attorney, prepared the documents. (ATTASCO/II Tr. 57–60.) The Sausens received the interest payments and the return of their principal in a timely fashion, confirming their faith in Schick. (ATTASCO/I Tr. 45–46.)

### 3. The December 1995 Transaction

In December 1995, the Sausens again wanted to invest in a Schick transaction. Instead of dealing through Silberberg, they desired to deal directly with Schick. (*Id.* at 48; ATTASCO/II Tr. 69–70.) According to Leonard, they felt more comfortable dealing with Schick, and also thought that by cutting out Silberberg, they could receive whatever compensation he would otherwise get as his part of the deal. (ATTASCO/I Tr. 91–92.) They called Schick to arrange a meeting to discuss possible investment opportunities, (ATTASCO/II Tr. 32), and as a result, had their first and only real meeting with Schick in Schick's law office.[8] Schick advised the Sausens that he would deal directly with them provided Silberberg did not object, and they were prepared to act quickly. (ATTASCO/I Tr. 49–50.)

During the meeting, Schick described two types of investments. The first, rehabilitation projects, did not interest the Sausens because it was too risky. (*Id.* at 50–51.)[9] The second involved what Leonard described as "show me" money, and is the same type of mortgage portfolio investment that attracted Brodie. In order to convince the Resolution Trust Corporation that he (or Venture Mortgage Fund, one of Schick's business entities) was a serious investor in mortgage portfolios, Schick had to maintain bank accounts showing substantial sums at his disposal. Schick would borrow money from the Sausens for 90 to 120 days, pay a fee, and maintain the money in an attorney's escrow account. The Sausens could verify the deposit by calling the bank, but the Sausens had to be ready to act within 48 hours of Schick's request. (*Id.* at 51–52; ATTASCO/II Tr. 13–14.) According to Allen, Schick also explained to the Sausens that he only worked with clients with substantial means and liquidity, but would be willing to do business with the brothers because he had "a relationship" with them. (ATTASCO/II Tr. 14–15.)

Schick showed the Sausens transaction documents he had used on other deals, including the Regal Trade deal, and said he could act quickly because he used the same documents on all of his deals. (ATTASCO/I Tr. 52–53.) According to Allen, Schick also stated that he acted as the attorney of record on the transactions and prepared all of the documents. (ATTASCO/II Tr. 11–12). Allen could not recall whether they discussed the rate of interest. (*Id.* at 17.) Schick promised to inform them within a few days if he had a deal, and he thought he would. (ATTASCO/I Tr. 56–57.)

Several days after the meeting, the Sausens called Schick and advised him that they were ready, willing and able to proceed. (*Id.* at 59.) Schick told them he had a deal, and the Sausens sent a fax to Schick summarizing the material terms of the transaction. (*See* ATX 15.) Allen testified that Schick specified the terms over

---

**8.** Allen Sausen had been introduced to Schick by Silberberg in the fall of 1993, but they did not discuss any business at that time because Silberberg had been assigned to work on Allen's mortgage transaction. (ATTASCO/II Tr. 8.)

**9.** Allen testified that he and his brother told Schick during that meeting that they were not wealthy, any money to be invested represented savings for their children, they were not sophisticated investors and that they did not want to do anything that was risky. (ATTASCO/II Tr. 10.)

the phone, including the interest rate. (ATTASCO/II Tr. 16–18). The fax confirmed that ATTASCO would advance $1.1 million for a minimum of 120 days, and receive interest at the monthly rate of 2.25%.

They subsequently received the draft transaction documents from Schick, compared them with the Regal Trade documents, found them to be substantially similar,[10] but never asked an attorney to review them. (ATTASCO/I Tr. 65.) They certainly didn't rely on Schick; they never requested or received legal advice from him,[11] (id. at 68), and understood that he was on the other side of the transaction. (Id. at 95–96; ATTASCO/II Tr. 41–43.) [12]

The Sausens also never discussed the interest rate with Schick or whether that rate was legal under New York law. (Id. at 49, 70.) According to Allen, Schick specified the terms of the loan, including the interest rate, on a "take it or leave it" basis. (Id. at 50–53.) Although the Sausens were aware that they were receiving interest at the rate of 2.25% per month, they were concerned with the safety of the investment and the amount they would receive each month and calculated the dollar return; the percentage per se was not an issue. (ATTASCO/I Tr. 95; ATTASCO/II Tr. 49, 52–54.)

On or about December 20, 1995, the parties executed the transaction documents and the Sausens funded the $1.1 million loan. The transaction documents included an escrow agreement, (ATX 16), a promissory note in the sum of $1.1 million, (ATX 17), and a "shtar iska." (ATX 18.) The note called for monthly interest payments in the sum of $24,750.00, and the return of principal and the final monthly interest payment in April 1996. The Sausens received the interest payments due in January, February and March. (ATTASCO/I Tr. 69.)

### 4. The February 1996 transaction

In February 1996, the Sausens again sought out Schick to invest more money. (Id. at 70–71.) [13] In a fax dated February 11, 1996, they advised Schick, among other things, that an additional $750,000.00 to $1,000,000.00 was "available immediately." (ATX 21; ATTASCO JPTO ¶ 5(m).) Schick told them that he had another deal; they would use the same documents, and everything would be the same. (ATTASCO/I Tr. 72; ATTASCO/II Tr. 22, 24.)

The second transaction involved an $850,000.00 loan for 60 to 90 days.[14] On February 13, they faxed Schick a confirmation of the new transaction describing the material terms. (See ATX 22.) Leonard and Allen would wire $250,000.00 and $600,000.00, respectively. (Id.) Except for the amount, the terms were similar to the December loan.[15] The Sausens even-

---

**10.** They discovered only one difference: the new documents did not specifically identify the bank where the escrow would be maintained, or the identity of the loan officer. (ATTASCO/I Tr. 56–57; ATTASCO/II Tr. 18–20.)

**11.** The Sausens did not sign a retainer agreement with Schick, nor did they ever receive a bill from or pay a fee to Frenkel & Hershkowitz for legal services. (ATTASCO/II Tr. 45, 65–66.)

**12.** Despite this, Allen testified to his belief that Schick was acting as his legal counsel when Schick drafted and signed the promissory note and escrow agreement as "David Schick, partner of Frenkel and Hershkowitz", (ATTASCO/II Tr. 41, 45–49), and assured the

brothers that he would protect their interests and that the documents were completely legal. (Id. at 52.)

**13.** Allen testified that Schick called him in February of 1996 to advise him that he was working on another possible mortgage acquisition and asked him to participate. (ATTASCO/II Tr. 22.)

**14.** The note eventually executed by the parties required repayment in four months. (See ATX 23.)

**15.** Apparently, the only difference was a change in the escrow account number and the name of the bank. Allen asked Schick about the changes, and felt comfortable with

tually received the documentation from Schick, performed the same type of comparison they did the last time, and again, did not consult an attorney. (ATTASCO/I Tr. 73–74; ATTASCO/II Tr. 26–28.) They executed similar transaction documents, (see ATX 23 (promissory note), ATX. 24 (escrow agreement), ATX 25 ("shtar iska")), and the Sausens funded the second loan. Allen Sausen testified that he believed that the risk associated with the February 1996 transaction was slightly greater than an investment in a United States Treasury Bill. (ATTASCO/II Tr. 63.) He did not consider it unusual to receive a 27% return on an essentially risk-free investment because he and his brother had to have the money ready at a moment's notice. (Id. at 64, 81–82.)

### 5. The Events Leading to Bankruptcy

The Sausens received the March payments due under the notes, but did not receive the April payments. Leonard called Schick, who left him with the impression that they would receive their money later that month after the Passover holiday. When they did not, they started calling Schick. (ATTASCO/I Tr. 76.) After several tries, they reached him. Schick told Leonard that he had bad news; it was all over, and all of the money was gone. This was the Sausens' last conversation with Schick. (Id. at 77.)

After bankruptcy ensued, ATTASCO interposed timely claims in three Schick-related cases. On or about November 24, 1996, it filed a secured claim in the Venture bankruptcy case in the amount of $2,462,750.00, inclusive of $1,950,000.00 in principal and accrued interest. (ATTASCO JPTO ¶5(q); see ATX 31.) On or about February 28, 1997, ATTASCO also filed secured claims in the amount of $2,598,875.00 in the Schick bankruptcy case, (ATTASCO JPTO ¶5(r); see ATX

32), and the Venture Mortgage Corporation bankruptcy case. (ATTASCO JPTO ¶5(s); ATX 33.)

### DISCUSSION

The trustees challenge Brodie's and ATTASCO's claims as usurious loans. The trustees also contend that Brodie is judicially estopped from asserting his claim. He amended his tax returns, re-characterizing Schick's interest payments as the return of principal, and received a tax refund. He cannot now argue that the principal remains unpaid. Brodie opposes the judicial estoppel claim, and the claimants and the Official Creditors' Committee (the "Committee") in the Schick case dispute the applicability of the usury defense for two reasons that are intertwined. First, they contend that the usury statutes do not apply to the types of loans at issue. Second, they contend that the trustees are equitably estopped from asserting the defense of usury.

### A. Judicial Estoppel

■■■■ Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir.), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). It is intended to "protect the sanctity of the oath and the integrity of the judicial process ... by avoiding the risk of inconsistent results in two proceedings." Id. (citation omitted); accord Rosenshein v. Kleban, 918 F.Supp. 98, 104 (S.D.N.Y.1996) ("Judicial estoppel is invoked ... to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process"); Official Committee of Creditors of Maxwell Newspapers, Inc. v. MacMillan (In re Maxwell Newspapers, Inc.), 189 B.R. 282, 289 (Bankr.S.D.N.Y.

Schick's response that he had merely switched his account to another bank. (AT-

TASCO/II Tr. 26–27.)

1995) ("Judicial estoppel prevents a party who benefits from the assertion of a certain position from subsequently adopting a contrary one"). It is a rarely used doctrine designed "to protect the court, not a party, from a party's chicanery." *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 840 F.Supp. 211 (E.D.N.Y.1994) (citation omitted).

 In this circuit, a litigant invoking judicial estoppel must show that (1) the party against whom estoppel is asserted took an inconsistent position in a prior proceeding, and (2) the first tribunal adopted the inconsistent position in some manner, such as by rendering a favorable judgment. *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2d Cir.2000); *Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 6 (2d Cir.1999); *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir.1997); *Bates,* 997 F.2d at 1038. If the statements or positions in question can be reconciled in some way, estoppel does not apply. *See Simon v. Safelite Glass Corp.,* 128 F.3d 68, 72–73 (2d Cir.1997). Similarly, the doctrine does not apply if the initial statement was the result of a good faith mistake or unintentional error. *Id.* at 73.

 The prior inconsistent position need not be asserted in a court of law; statements to administrative agencies may also qualify. *See, e.g., Mitchell,* 190 F.3d at 6 (statements to Social Security Administration and Workers' Compensation Board); *Simon,* 128 F.3d at 72–73 (statements to Social Security Administration). Moreover, the statement need not be made in the context of an administrative hearing or adjudication. One made in an application for benefits may qualify. *See e.g., Mitchell,* 190 F.3d at 6 ("statements to administrative agencies, such as to the Social Security Administration in applying

for disability benefits, may also give rise to judicial estoppel"); *Simon,* 128 F.3d at 72 (stating that many courts have precluded litigants from advancing positions contrary to statements made in applications for Social Security disability benefits); *Morlino v. Staten Island Univ. Hospital,* No. 95 CV 3891(NG), 1998 WL 160937 (E.D.N.Y. April 1, 1998) (certification on a New York State application for disability benefits sufficient to judicially estop), *aff'd,* 173 F.3d 845 (2d Cir.1999); *cf. Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 1604, 143 L.Ed.2d 966 (1999) (court should require claimant to explain apparent inconsistency in position on disability asserted in claims under the Social Security and Americans with Disabilities Act).

 According to the trustees, Brodie stated to the IRS in his amended tax returns that he received approximately $300,000.00 in principal from Schick during 1993 through 1995. He sought a tax refund, and the IRS refunded at least $50,-000.00 to him, thereby adopting his contention.[16] This is not as clear as the trustees suppose. Brodie sought a tax refund of $67,169.00, but received only $50,000.00. No explanation was offered for the difference, and there is no record of adjudicative or other proceedings before the IRS. Thus, I am left with two possibilities: the IRS rejected Brodie's position in part, or the actual refund represents a settlement reached between the IRS and Brodie.

In either case, the trustees have failed to meet their burden of proving the second element of their claim. If the IRS partially rejected Brodie's position and I cannot tell which part, if any, it accepted, judicial estoppel cannot apply. *In re Coastal Plains, Inc.,* 179 F.3d 197, 207 (5th Cir. 1999) (judicial estoppel does not apply where it is not possible to determine

16. As a threshold matter, Brodie asserts that I improperly amended the pre-trial order to permit the trustees to argue and admit evidence concerning the issue of judicial estoppel. I need not decide this issue because I agree that judicial estoppel does not apply.

However, the issue of judicial estoppel could not have become part of the case unless and until Brodie received a refund. He did not receive the refund until approximately one week before the trial, and did not reveal it to the trustees prior to his trial testimony.

whether initial tribunal relied on previous inconsistent statement in rendering its decision), *cert. denied,* — U.S. ——, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); *see also Teledyne Industries, Inc. v. N.L.R.B.,* 911 F.2d 1214, 1218 (6th Cir.1990) (agreed orders lacking any findings did not constitute "judicial acceptance" for the purpose of applying judicial estoppel). Similarly, while some courts have judicially estopped a litigant from asserting facts inconsistent with statements in a prior proceeding that resulted in a settlement, *see, e.g., Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 604 (9th Cir.1996); *Kale v. Obuchowski,* 985 F.2d 360, 361–62 (7th Cir. 1993), the law in this circuit is otherwise. *See Bates,* 997 F.2d at 1038 (a party cannot be judicially estopped on the basis of prior inconsistent statements made in previous litigation that resulted in a settlement, emphasizing that estoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision); *accord TLC Beatrice Int'l Holdings, Inc. v. CIGNA Ins. Co.,* No. 97–Civ. 8589(MBM), 1999 WL 33454, at *7 (S.D.N.Y. Jan. 27, 1999) ("The Estate's position was not 'adopted' by the court, because the action ended in a settlement"); *Universal City Studios v. Nintendo Co.,* 578 F.Supp. 911, 921 (S.D.N.Y.1983) (" 'settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel' ") (quoting *Konstantinidis v. Chen,* 626 F.2d 933, 939 (D.C.Cir.1980)), *aff'd,* 746 F.2d 112 (2d Cir.

1984); *see also Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 (6th Cir.1982) ("if the initial proceeding results in settlement, the position cannot be viewed as having been successfully asserted").[17] Accordingly, Brodie is not judicially estopped from asserting his claim.

## B. Usury

### 1. The Trustees' *Prima Facie* Cases

 New York's civil usury laws prohibit a lender from charging more than 16% interest on a loan, subject to certain exceptions that are not relevant here. *See* N.Y. Gen. Oblig. L. § 5–501 (McKinney 1989); N.Y. Bank. L. § 14–a (McKinney 1990). Further, charging a rate of interest in excess of 25% per annum constitutes criminal usury, and is a felony under New York's penal law.[18] Penal Law § 190.40 states:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property of interest on the loan or forbearance of money or other property, at a rate exceeding twenty-five percent per annum or the equivalent rate for a longer or shorter period.

N.Y. Penal L. § 190.40 (McKinney 1998).

 Criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance. The first element requires proof of the

---

**17.** There is some authority that a settlement approved by a court may be a basis for judicial estoppel. *See Manhattan Avenue Dev. Corp. v. Meit,* 224 A.D.2d 191, 637 N.Y.S.2d 134, 134 (N.Y.App.Div.1996) ("While a settlement does not constitute a 'judicial endorsement' of either party's claims or theories and thus does not provide the prior success necessary for judicial estoppel ..., here, the stipulation was so-ordered by the court, which thereby inferentially endorsed plaintiff's then position concerning its assets, satisfying the 'prior success' element necessary for judicial estoppel") (citations omitted); *cf. Carabetta*

*Enterprises, Inc. v. City of Asbury Park (In re Carabetta Enterprises, Inc.),* 162 B.R. 399, 408 (Bankr.D.Conn.1993) (party to settlement agreement could not be judicially estopped where settlement had not been approved by court order or position otherwise adopted by court). Here, it is unnecessary to decide this issue as there is no evidence that any court approved a settlement between Brodie and the IRS.

**18.** The civil and criminal usury rates have not changed during the relevant period.

general intent to charge a rate in excess of the legal rate rather than the specific intent to violate the usury statute. *Angelo v. Brenner*, 90 A.D.2d 131, 457 N.Y.S.2d 630, 632 (N.Y.App.Div.1982); *Hammond v. Marrano*, 88 A.D.2d 758, 451 N.Y.S.2d 484, 485 (N.Y.App.Div.1982); *Estate of Dane*, 55 A.D.2d 224, 390 N.Y.S.2d 249, 250 (N.Y.App.Div.1976); *see United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104 (1986). Accordingly, the borrower satisfies his *prima facie* burden of proving usury by showing that the note given to the lender evidences a loan and reserves an illegal rate of interest. *Clark v. Daby*, 225 A.D.2d 974, 639 N.Y.S.2d 549, 550 (N.Y.App.Div. 1996); *Crawford v. Carlton*, 73 A.D.2d 530, 422 N.Y.S.2d 402, 402 (N.Y.App.Div.1979); *Estate of Dane*, 390 N.Y.S.2d at 250. If usury is proved, the loan is deemed void, and the lender sacrifices his principal and interest. *See* N.Y. Gen. Oblig. L. § 5–511(2) (McKinney 1989); *Seidel v. 18 East 17th Street Owners, Inc.*, 79 N.Y.2d 735, 586 N.Y.S.2d 240, 598 N.E.2d 7, 9 (1992).

Here, the trustees met their burden of going forward at both trials simply by introducing the notes evidencing the usurious transactions. The Brodie $200,-000.00 rollover note and the two ATTASCO notes, aggregating $1,950,000.00, each bear interest at a monthly rate of 2.25%, or the annual rate of 27%. The notes evidence loan transactions within the meaning of the usury statute,[19] the claimants received their respective notes and were aware of their terms. This evidence shifted the burden of going forward to the claimants, requiring them to produce evidence negating the application of the usury defense. In response, the claimants (and the Committee) have made two, interrelated arguments.

### 2. The Intent of the Usury Laws

Initially, they insist that the usury defense was never intended to apply to the types of loans at issue in these proceedings. The usury laws, they say, were designed to thwart loan-sharking and the gouging of needy borrowers by unscrupulous moneylenders. *See Seidel*, 586 N.Y.S.2d 240, 598 N.E.2d at 9 (purpose of usury laws is " 'to protect desperately poor people from the consequences of their own desperation' ") (quoting *Schneider v. Phelps*, 41 N.Y.2d 238, 391 N.Y.S.2d 568, 359 N.E.2d 1361, 1365 (1977)); *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 446 N.Y.S.2d 917, 431 N.E.2d 278, 283 (1981) (criminal usury law was created to increase assault against lenders who use "roughing up tactics" while civil usury law was created to curb loan-shark racket as a complement to criminal law); *Orvis v. Curtiss*, 157 N.Y. 657, 52 N.E. 690, 691 (N.Y.1899) (stating that "[t]here must exist, in fact or in law, a corrupt purpose or intent on the part of the person who takes the security to secure an illegal rate of interest for the loan ... and it must appear that the real purpose of the negotiations and transactions was, on the one side, to loan money at usurious terms dictated by the lender"), *reargument denied*, 159 N.Y. 527, 53 N.E. 1129 (1899). According to the claimants, they are not loan sharks, and Schick was not a needy or desperate borrower. Moreover, the claimants paint themselves as victims of Schick's fraudulent scheme, having placed their trust and reliance in his reputation, knowledge and ability.

Whatever the genesis of the usury laws may have been, the language of the usury statutes invoked by the trustees reflects a much broader purpose. Penal Law § 190.40, quoted above, is drawn in general terms, is unambiguous, and reaches all loans where the lender knowingly charges interest in excess of 25%. It does not distinguish among types of borrowers or lenders, their relative knowledge and sophistication, or the purpose of the loan.

---

19. As noted, the claimants have abandoned their earlier positions that their transactions with Schick were not loans, or that the monthly 2.25% payments were not interest.

Under New York's general principles of statutory construction, the clear and unambiguous language of a statute should be construed so as to give effect to the plain meaning of the words. *See People ex rel. Harris v. Sullivan,* 74 N.Y.2d 305, 546 N.Y.S.2d 821, 545 N.E.2d 1209, 1211 (1989); *People v. Robinson,* 697 N.Y.S.2d 23, 23 (N.Y.App.Div.1999) (citing *People v. Bolden,* 81 N.Y.2d 146, 597 N.Y.S.2d 270, 613 N.E.2d 145, 149 (1993)); *Viruet v. City of New York,* 181 Misc.2d 958, 695 N.Y.S.2d 663, 667 (N.Y.Sup.Ct.1999). Further, where the statute condemns the transaction, general equitable considerations cannot temper the result. *Estate of Dane,* 390 N.Y.S.2d at 250.

■ The claimants' theory is also undercut by an examination of other provisions of the usury laws. These contain express limitations demonstrating the legislature's ability to narrow their range when desirable. For example, civil usury cannot be raised as a defense to loans equal to or exceeding $250,000.00 that are secured by certain real estate, N.Y. General Obligations Law § 5–501(6)(a), or loans equal to or exceeding $2.5 million. *Id.* § 5–501(6)(b). In addition, most corporations are barred from asserting civil usury. *Id.* § 5–521(1), (2). Having drawn these limitations, the legislature nevertheless refused to extend them to criminally usurious transactions. *Id.* §§ 5–501(6)(a), (6)(b), 5–521(3). Here, the legislature did not limit the usury laws in the manner suggested by the claimants and the Committee, implying that the legislature did not intend to impose these limits. I conclude, therefore, that the usury laws apply to the transactions between the claimants and Schick.

**3. Estoppel**

■ Next, the claimants and the Committee argue that Schick and Venture, and hence, their trustees, are estopped from asserting usury based upon Schick's "special relationship" with the claimants. In *Seidel,* the New York Court of Appeals recognized that a borrower may be estopped from asserting usury as a defense:

> The Appellate Divisions, and the majority of States to consider the issue, have recognized that a borrower may be estopped from interposing a usury defense when, through a special relationship with the lender, the borrower induces reliance on the legality of the transaction .... We endorse such a rule. Otherwise, a borrower could void the transaction, keep the principal, and "achieve a total windfall, at the expense of an innocent person, through his own subterfuge and inequitable deception[.]"

586 N.Y.S.2d 240, 598 N.E.2d at 11 (citations omitted). The court emphasized, however, that "[a]n indispensable requisite of an estoppel in pais, is that the conduct or representation was intended to, and did, in fact, influence the other party to [her] injury." *Id.* (quoting *Payne v. Burnham,* 62 N.Y. 69, 73 (N.Y.1875)); *accord Diller v. Schick,* No. 96 Civ. 4140(AGS), 1998 WL 91099, at *2 (S.D.N.Y. Mar.2, 1998)(denying summary judgment based on factual dispute, *inter alia,* concerning whether the borrower induced the lender to rely on the legality of the transaction). Thus, to prevail on an estoppel claim, a lender must prove (1) a "special relationship" with the borrower (2) a representation by the borrower that the transaction was legal, (3) an intent by the borrower to induce reliance on the representation, (4) actual reliance, and (5) injury. *Seidel,* 586 N.Y.S.2d 240, 598 N.E.2d at 11; *see International Minerals & Resources, S.A. v. Pappas,* 96 F.3d 586, 594 (2d Cir.1996).

**a. "Special Relationship"**

■ A "special relationship" includes an attorney-client, fiduciary or trust relationship, or a longstanding friendship or similar relationship. In addition, it is usually characterized by superior knowledge, experience or sophistication that enables the borrower to induce the lender to make the loan at a usurious rate. *See, e.g., Seidel,* 586 N.Y.S.2d 240, 598 N.E.2d at 11

(principal of borrower was lender's attorney, suggested the interest rate and drafted the documents); *Pemper v. Reifer,* 695 N.Y.S.2d 555, 557 (N.Y.App.Div.1999) (borrower was general partner of lender limited partner, was experienced in real estate finance and proposed the interest rate); *Abramovitz v. Kew Realty Equities, Inc.,* 180 A.D.2d 568, 580 N.Y.S.2d 269, 270 (N.Y.App.Div.1992) (defendant-borrowers were experienced and sophisticated businessmen and lawyers who took advantage of plaintiff's long-standing friendship and trust in his attorney, Mordowitz, who drafted the original documents and set the financial terms that defendants now claim are usurious); *Hammond v. Marrano,* 451 N.Y.S.2d at 486 (borrower was close friend of the lender with superior knowledge and experience); *Angelo v. Brenner,* 90 A.D.2d 131, 457 N.Y.S.2d 630, 632 (N.Y.App.Div. 1982) (borrower induced lender to make loan based upon friendship, sympathy for borrower's urgent financial plight and personal problems with his son, and lender's total business inexperience). The fact that the borrower suggests the interest rate, standing alone, does not relieve the lender of the usury defense. *Pemper v. Reifer,* 695 N.Y.S.2d at 557; *Estate of Dane,* 390 N.Y.S.2d at 250.

■ The claimants failed to prove the existence of an attorney-client or other "special relationship" with Schick. Generally, an attorney-client relationship exists where a party "divulges confidences and secrets to an attorney believ[ing] that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F.Supp. 233, 237 (S.D.N.Y.1994). Factors considered by courts include: (i) whether a fee arrangement was entered into or a fee was paid; (ii) whether there is a written retainer agreement indicating that the attorney accepted the representation; (iii) whether there was an informal relationship pursu-

ant to which the attorney performed legal services gratuitously; (iv) whether the attorney actually represented the individual in one aspect of the matter; (v) whether the attorney excluded the individual from some aspect of litigation in order to protect a client's interest; and (vi) whether the purported client reasonably believes that the attorney was representing him. *Id.* (citations omitted). The fact that an attorney-client relationship existed between the parties in the past is not dispositive on the issue of the existence of a present relationship. *See People v. Modeste,* 159 Misc.2d 250, 603 N.Y.S.2d 955, 960 (N.Y.Sup.Ct.1993).

■ There are few indicia of an attorney-client relationship between Brodie and Schick. Schick's law firm represented Brodie several years earlier in a few unrelated transactions in which Silberberg did the day-to-day work. (Brodie Tr. at 79.) When Silberberg left Schick's law firm at the end of 1992 to start his own practice, (*id.* at 15), he took Brodie as a client, performing legal work for Brodie from 1993 through 1995. (*Id.* at 78–79, 145.) [20] Neither Schick nor his firm represented Brodie at the time of the $200,000.00 rollover. The rollover was a business transaction between the two, and the evidence demonstrates that Brodie did not seek or pay for any legal advice from Schick. While Brodie testified that Schick assured him that he was his lawyer, (*id.* at 82), the statement was supposedly made during a conversation in which Brodie allegedly sought assurances that the transaction was legal. (*See id.*) As explained below, I find this testimony regarding the discussion of legality incredible.

■ ATTASCO'S reliance on the "special relationship" exception is even more attenuated. Schick never represented ATTASCO, ATTASCO never sought legal advice from him in connection with the two usurious transactions, and the Sausens

---

**20.** Brodie claims ignorance that Silberberg was no longer affiliated with Schick when

Silberberg performed legal services for him after 1992. (Brodie Tr. 144.)

grasped that they were involved in business deals with Schick on the other side. They pursued him as a source of investment, not legal advice,[21] a distinction they took pains to draw. When Leonard was questioned about the Sausens' relationship with Silberberg, he emphatically declared that they dealt with him as a deal maker, not as an attorney. (ATTASCO/I Tr. 80.) Yet they were satisfied with the legality of the Regal Trade transaction based on their faith and trust in Silberberg, (*see* ATTASCO/I Tr. 44; ATTASCO/II Tr. 59–60), the same faith and trust they placed in Schick. The Sausens' subjective belief that Schick was their lawyer but Silberberg was not seems a convenient distinction under the circumstances.

Further, neither ATTASCO nor Brodie were unsophisticated or inexperienced lenders overborne by a borrower in whom they had naively placed unquestioned trust. The claimants were looking to invest large sums, and in fact, the Sausens aggressively sought Schick out. Brodie and the Sausens did not think they were entering into a different relationship with Schick, only to find that Schick was inducing them to make loans they had not anticipated. Further, neither relied solely on Schick's draftsmanship. Brodie asked his accountant to review the first set of transaction documents in 1992. The Sausens personally pored over all of the documents that Schick sent, comparing the various versions in search of inconsistencies. If they trusted Schick, they trusted him to continue to pay large returns on supposedly risk-free loans. Here, the only "special relationship" they shared was the symbiotic one existing between an investor with a lot of cash and a deal maker who could apparently put it to good and very profitable uses. Accordingly, I conclude that each of the claimants failed to prove that they and Schick shared a "special relationship" within the meaning of this exception to the usury defense.

### b. Reliance

Even if a "special relationship" existed, the claimants failed to prove that they somehow relied on a belief that the transactions were legal. There is certainly no evidence that Schick ever made representations regarding the legality of the interest rate. Assuming, however, that he was under an affirmative duty to do so, *see, Abramovitz v. Kew Realty Equities, Inc.,* 580 N.Y.S.2d at 270, it is still not credible that the belief in legality affected the claimants' decisions to invest.

First, neither of the claimants focused on the legality of the interest rate. Their overriding worry was the religious proscription against charging any interest, not the Penal Law's proscription against charging usurious interest. Consequently, in each instance they entered into a "shtar iska" with Schick. Through this religious document, they characterized their transactions as partnership contributions rather than loans, and the monthly payments as a return of profits rather than interest. Under the circumstances, I am hard-pressed to find that the claimants and Schick discussed the legality of a specific interest rate, or that they were concerned about the legality of a specific interest rate.

Second, the implication that they relied on assurances of legality is self-serving and not plausible. Brodie was an experienced money lender. Throughout the years, he testified that he was unwaveringly guided by four investment criteria: (1) in case of default, he could get his money back without any hindrance from a bankruptcy court or the like, (2) he would receive substantial "iska" payments, (3) the loan would be fully secured, and (4) the borrower would pay all related legal fees. (*See* Brodie Tr. at 59, 67–68.) Thus, he was concerned with the amount of the monthly payment, the collectibility of the

---

**21.** As late as April 11, 1996, and only a few days before Schick's default, the Sausens were still soliciting Schick, requesting him to

"advise immediately" if he needed more money. (ATX 27.)

loan in the event of the borrower's insolvency and the payment of the transaction fees. He never gave a thought to the legality of the transaction, or specifically the interest rate, until he testified that he did at trial. Similarly, the Sausens aggressively pursued Schick as the vehicle to invest their substantial sums, and cut out Silberberg to increase their own return. Again, there is no credible evidence that a belief in the legality of the interest rate played a role in their decision to lend.

In truth, the overriding—indeed the only—impetus impelling them to invest with Schick was the promise of future riches that seemed too good to be true. In a moment of candor, Brodie admitted that he "relied on Iska payments coming every month on time for three and a half years or so, and all the agreements that he had structured, to my knowledge, were terrific, and that is what I relied on, *nothing else.*" (*Id.* at 97–98)(emphasis added.) In fact, Brodie invested $500,000.00 with Schick during the summer of 1992, and despite Schick's failure to repay the $200,000.00, still received, directly or indirectly through payments to Silberberg, well over $600,-000.00 in principal and interest during the ensuing three-and-one-half years.

In the same vein, the Sausens were "thrilled and overjoyed" by Schick's earlier performance in the Regal Trade transaction. (ATTASCO/I Tr. 47.) Viewing their investments, which returned 27% annually, as only slightly more risky than a U.S. Treasury Bill, (ATTASCO/II Tr. 63), it is little wonder that they were willing and anxious to lend him money. It was unfortunate for the claimants that something that seemed too good to be true, in the end, was neither too good nor too true. But they have failed to offer any legal or factual reason to except themselves from the usury defense asserted by the trustees for the benefit of the other unpaid creditors in these cases.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Settle order on notice.